Filed 8/27/14  Rodman v. Blake CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| MICHAEL T. RODMAN,<br><br>        Plaintiff, Cross-defendant, and Appellant,<br><br>        v.<br><br>SHARON BLAKE et al.,<br><br>        Defendants, Cross-complainants, and Appellants. | D061434<br><br><br><br>(Super. Ct. No. 37-2008-00057170-CU-CO-NC) |

        APPEALS from a judgment and postjudgment orders of the Superior Court of

San Diego County, Earl H. Maas III, Judge.  Judgment reversed in part with directions,

affirmed in part; postjudgment order affirmed; postjudgment order reversed with directions.


        Wingert Grebing Brubaker & Juskie, Stephen C. Grebing and Deborah S. Dixon, for

Plaintiff, Cross-defendant, Respondent and Appellant Michael T. Rodman.

        Mara C. Allard for Defendants, Cross-complainants, Respondents and Appellants,

Sharon Blake et al.

Plaintiff Michael T. Rodman and defendant Sharon Blake formed a limited liability company (LLC) named Masterpiece Properties (MP) for the purpose of owning 10 acres of real property (the property) in Rancho Santa Fe, California.  MP purchased the property with a $1 million loan (the mortgage loan), and Blake operated a horse business on the property through her solely owned corporation, defendant Sharlana Farms, Inc. (Sharlana).[1]  Rodman and Blake entered into an operating agreement for MP (the OA) under which each was a 50 percent owner of MP and had the right to effect a subdivision of the property whereby Rodman would own a parcel consisting of approximately three acres and Blake would own the remaining seven acres.  Under the OA, Blake was responsible for paying $700,000 of the mortgage loan and Rodman was responsible for paying the remaining $300,000 of the loan.  About seven and a half years after the parties entered into the OA, Rodman sued defendants for dissolution of MP, an accounting, and other causes of action arising out of Blake's alleged refusal to cooperate in effecting a subdivision of the property.  Defendants countersued Rodman, seeking, among other things, damages for breach of fiduciary duty and reformation of the OA.  The litigation resulted in a final judgment that reformed the OA, dissolved MP, ordered a subdivision of the property, and adopted findings of a court-ordered accounting report.

Defendants appeal from the judgment, contending the court-ordered accounting is replete with legal error, the judgment erroneously requires Blake to pay rent to Rodman for her use of the property, the court abused its discretion either by denying defendants' motion

---

[1]     We will refer to Blake individually as Blake and to Blake and Sharlana collectively as defendants.

to reopen evidence before the accounting or denying their motion to set aside the accounting findings, and the judgment erroneously omits factual findings necessary to a complete resolution of the litigation.  Defendants also appeal a postjudgment order denying their motion for an allocation of subdivision costs, and an order denying both their and Rodman's motions for attorney fees.  Rodman also appeals the postjudgment order denying attorney fees.  We reverse the portion of the judgment adopting the accounting's findings regarding the parties' obligations on the mortgage loan and liability for MP's expenses with directions, and the order denying the motions for attorney fees with directions.  We otherwise affirm the judgment and affirm the postjudgment order denying defendants' motion for an allocation of subdivision costs.

FACTUAL AND PROCEDURAL BACKGROUND

MP purchased the subject property from Sharlana in January of 2001.  At the time of the purchase, Blake owned five percent of Sharlana's stock and her friend Bryant Morris owned the other ninety-five percent.  According to Blake's first amended cross-complaint, Blake (Sharlana) acquired the property by purchasing an undeveloped nine-acre parcel for $550,000 and an adjoining one-acre parcel for $40,000.  Morris provided approximately $290,000 as a down payment and cosigned a loan with Blake for the balance.  Morris later cosigned a $700,000 loan that retired the original mortgage and provided construction funds to develop the property.

In the summer of 2000, Rodman made an offer to Blake to purchase the upper three acres of the property for $375,000, with the understanding that the property would be subdivided sometime in the future.  Blake would use the cash payment to repay the down

3

payment Morris provided to purchase the property. Rodman also offered to obtain a new $700,000 loan that would be used to pay off the existing first mortgage on the property and have a lower monthly payment. He told Blake he would help her obtain a construction loan for the purpose of building a house on her portion of the property. Although Blake had received an offer to purchase the upper three acres for $600,000, she accepted Rodman's offer because he agreed to act as her financial advisor and help her obtain a construction loan.

In October 2000, Rodman told Blake that he was having trouble obtaining a loan to cover his $375,000 cash payment. However, he deposited $75,000 in an escrow account to reassure her that he would obtain the money.

In January 2001, Rodman told Blake he was unable to come up with the cash portion of his offer but could obtain a $1 million loan instead of a $700,000 loan to cover $300,000 of his $375,000 cash payment. On January 5, 2001, Blake met Rodman at an escrow office where he presented her with numerous documents to sign, including the OA and related documents. Blake testified that she signed all of the documents without reviewing them. One of the documents she signed on behalf of Sharlana was a lease, under which Sharlana agreed to pay MP monthly rent for Sharlana's use of the property. Under the OA, Sharlana's lease payments were to be applied toward Blake's $700,000 share of the MP's mortgage loan. Because of the new arrangement to purchase the property with the $1 million loan, Rodman withdrew $70,000 of the $75,000 he had placed in an escrow account. He testified that he told Blake he withdrew the money and she did not object.

4

A few days after Blake signed the OA and related documents, Rodman met with her and said he knew she was upset about the last-minute changes to their deal. He presented her with a document in his handwriting entitled "Side Adjustments between Sharon and Mike" (the side adjustments). The side adjustments provided that Sharlana's lease payments would be $5,750, representing 66 percent of MP's monthly mortgage payment. Rodman would pay the remaining 34 percent of the loan payments and "take the risk" of interest rates increasing for the first five years. If the rates decreased in the first five years, Blake's share of the mortgage payment (i.e., Sharlana's lease payment) would never be greater than 70 percent. After five years, the parties' split of the mortgage payment would be "70/30." The side adjustments stated that for five years, Rodman would pay up to $300 per month for accounting and bookkeeping for MP or Sharlana, and noted that Rodman had paid all of the closing costs for MP's purchase of the property.

In August 2008, Rodman filed a complaint against defendants for judicial dissolution, an accounting, and related causes of action arising out of Blake's alleged refusal "to cooperate in effectuating the lawful division of the [p]roperty [under the OA]." Rodman's operative first amended complaint omitted the dissolution cause of action and included causes of action for specific performance, judicial accounting, breach of contract, and declaratory relief. Defendants' operative first amended cross-complaint included causes of action for breach of fiduciary duty, rescission, declaratory relief, reformation of contract and breach of contract.

The case was tried to the court in January 2010. In February, Rodman filed an ex parte application to amend his first amended complaint to include dissolution in his prayer for relief. Defendants initially opposed the application, but later withdrew their opposition. The court granted the application.

In March 2010, the court filed a "Verdict After Court Trial," (the verdict) which reads like a statement of decision.[2] In the verdict, the court found that Rodman was not a fiduciary to Blake when they entered into their business relationship, "but became one once they agreed to be in business together." The court found that "Rodman 'sold' himself as the better buyer to Blake, and reviewed financial documents of Blake before the deal was finalized." However, based on the parties' testimony, the court found "the parties remained at [arm's] length until the signing of the documents."[3]

The court concluded "even though the parties remained at [arm's] length during negotiations, this does not relieve the requirement that the documents ultimately executed reasonably reflect the negotiations of the parties." The court found that although the handwritten documents reflecting the parties' negotiations and intentions "demonstrate a reasonable progression of give and take towards a mutually beneficial transaction, the final documents signed contain virtually none of the significant benefits to Blake, and actually add significant power and benefit to Rodman, while requiring virtually no capital contribution."

---

[2]    Rodman states that the court did not issue a tentative statement of decision and did not employ Code of Civil Procedure section 634 and California Rules of Court, rule 3.1590(g).

[3]    We have omitted the trial court's capitalization of the parties' names in the verdict and judgment.

Thus, the court found "that the final documents do not accurately reflect the agreement of the parties."

Regarding the OA that created MP and other "final documents," the court found there was "no evidence that [Blake] had any ability to understand the complicated LLC and other transactional documents presented to her at, or slightly before, the date of signing[,]" and that "at closing [Blake] merely signed documents as directed by Rodman." Therefore, the court granted Blake's request "to reform the contract to comply with the agreement established by the facts and testimony."

The court found "the 'lease payments' paid by [Sharlana to MP] were intended to be her mortgage payment for the lower part of the property. Indeed, were the evidence as argued by Rodman, that she was only credited for a portion of such payments, the 'deal' would be so one sided that this Court would likely rescind the entire contract rather than reform it." Accordingly, the court ruled that "Blake shall be credited with the entirety of her payments to [MP] towards her portion of the mortgage obligation." The court further found that the side adjustments were intended to become part of the agreement. Thus, the court ruled: "To the extent they are enforceable[,] the agreements contained in the [side adjustments] will be included in the final judgment."

The court concluded that reformation, followed by an accounting, followed by dissolution of MP was the proper remedy in this matter. Accordingly, the court granted Rodman's request to dissolve MP after completion of the accounting and subdivision of the property. The court ordered "that the agreement between the parties be reformed such that

7

parcels in question be subdivided and that Rodman receives the approximately upper 3 acres of the [property]. Blake shall receive the lower 7 acres."

The court further ordered: "The accounting shall evaluate payments made by each side after considering that the $1,000,000 loan is divided with $700,000 being attributed to Blake, and $300,000 being attributed to Rodman. All Mortgage/Lease payments made by Blake shall be accounted towards her portion of the loan. Interest for each portion shall be attributed to the respective party. All expenses shall be accounted for as follows: [¶] 1. Tax obligations shall be assessed 50% to each. [¶] 2. Insurance shall be assessed to Blake only. Legal expenses shall be divided equally. [¶] 3. Accounting and Bookkeeping shall be charged to Rodman only for the first 5 years, and then divided equally thereafter. [¶] 4. All closing costs for the sale of the property to [MP] shall be charged to Rodman. [¶] 5. All 'property management' costs shall be [borne] by and charged solely to Rodman. [¶] 6. The future costs associated with the division of the property [into] separate parcels shall be borne by the parties equally, with the Court maintaining jurisdiction to allocate them at a later time." The court ordered that once the subdivision of the property was complete, MP would be terminated and that "[a]ll legal relationships other than those required of adjacent property owners or easement holders shall then be terminated."

In April 2010, defendants filed a "Notice of Joint Designation of Accountant" stating the parties had agreed to use Brian P. Brinig to perform the accounting ordered in the verdict. In September 2010, Rodman filed an ex parte application for an order to show cause regarding Blake's failure to comply with the verdict and defendants, represented by new counsel, filed a motion to reopen the bench trial "for presentation of additional evidence to

8

facilitate dissolution and accounting."  The court denied Rodman's application without prejudice to refile it after entry of judgment and denied defendants' motion to reopen.  On October 27, 2010 the court entered a "Judgment on Verdict After Court Trial" setting forth the findings, rulings, and orders in the verdict, including the order for an accounting.

In September 2011, Brinig submitted his accounting report.  The report addressed how much Blake and Rodman each owed on their respective obligations on the $1 million mortgage loan and how much each had contributed to MP for expenses.  Brinig calculated that as of July 1, 2011, Blake owed $619,922 on her $700,000 share of the loan and Rodman owed $67,939 on his $300,000 share.  Based on the court-ordered allocation of expenses and loan payments between Rodman and Blake, Brinig determined Blake owed MP $18,632.45 and Rodman had a claim against MP for $21,089.23.

In November 2011, defendants filed a motion to set aside the accounting findings under Code of Civil Procedure section 643, subdivision (c), and Rodman filed a motion to charge Blake the reasonable value of her occupancy of the property.  The court denied defendants' motion and ordered that the judgment be amended to include the accounting. The court granted Rodman's motion and ordered Blake to pay Rodman "the rental sum of [$1,650] per month, beginning January 1, 2012, and continuing on a monthly basis until the property is legally divided, the property is sold, or [Blake] vacates the entire property."  The court's calculation of the monthly rent was based on its finding that $5,500 per month was the reasonable rental value of the property and its determination that Blake should pay Rodman 30 percent of that amount.

On December 15, 2011, Rodman submitted to the court and served on defendants a proposed "Amended Judgment on Verdict After Court Trial," which included the accounting findings and Blake's obligation to pay monthly rent to Rodman.  About the same time, defendants submitted and served a proposed "Judgment After Bench Trial and Accounting." Defendants' proposed judgment differed from Rodman's proposed judgment in several ways, one of which was that it included a provision for Rodman to reimburse her for 50 percent of certain expenses that she had claimed but the court had not awarded, stating:  "Mr. Rodman is required to reimburse Ms. Blake directly with 50% of the expenses she paid for the benefit of [MP] which amounts to _____."  The court signed and entered defendants' proposed judgment on December 20, 2011, but did not fill in any amount for Blake's claimed expenses.

Rodman brought an ex parte application requesting the court to reconsider its signing of defendants' proposed judgment, arguing, among other things, that the signed judgment included findings the court did not adjudicate.  The court issued a minute order explaining that when it signed defendants' proposed judgment, it had not received Rodman's proposed amended judgment and erroneously believed there was no dispute as to defendants' proposed judgment.  The court struck the judgment it signed on December 20, 2011 and, on January 25, 2012, signed and entered Rodman's proposed amended judgment with one modification that is not relevant to this appeal.

Defendants and Rodman both filed motions for attorney fees on the ground they were prevailing parties under Code of Civil Procedure sections 1032 and 1717. The court denied both motions, determining "there was no prevailing party in this action, as the results were mixed and did not constitute an unqualified win for either side."

Around the time the court entered the final amended judgment in January 2012, defendants filed a "Motion for Court Order for Subdivision Cost Allocation," seeking a different allocation of subdivision costs from the 50/50 allocation ordered in the verdict and judgment. Specifically, defendants requested an order that Blake would not be required to pay a share of certain mitigation and construction costs included in an estimate of the subdivision costs. The court denied defendants' motion on February 17, 2012.

## DISCUSSION

### *The Appealable Judgment*

The parties have conflicting views regarding which of the three "judgments" entered at different times in this case is appealable. Rodman incorrectly views the "Judgment on Verdict After Court Trial" entered on October 27, 2010 as appealable and reasons that defendants are barred from seeking review of any findings and rulings it contains because they did not file a notice of appeal from it and the time to do so has expired.

"Under the one final judgment rule, ' "an appeal may be taken only from the final judgment in an entire action." ' [Citations.] ' "The theory [behind the rule] is that piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and that a review of intermediate rulings should await the final disposition of the case." ' " (*In re Baycol Cases I and II* (2011) 51 Cal.4th 751, 756.) Thus, an appeal may not be taken from

11

an interlocutory judgment. (*First Security Bank of California, N.A. v. Paquet* (2002) 98 Cal.App.4th 468, 473.) "[O]ne type of an interlocutory judgment is '[w]here the ultimate judgment will be unconditional, but basic issues of law must be determined before evidence is heard and a final judgment rendered; *e.g., an interlocutory order determining the right to an accounting, then taking of the account and judgment for the amount found due*.' " (*Yeboah v. Progeny Adventures, Inc.* (2005) 128 Cal.App.4th 443, 448-449, italics added; *Schlyen v. Schlyen* (1954) 43 Cal.2d 361, 367 ["It is the general rule that an interlocutory judgment ordering an accounting is not final and not appealable."].) The October 27, 2010 judgment was not a final, appealable judgment because it ordered an accounting and contemplated future findings and rulings based on the accounting.

Defendants contend the judgment the court mistakenly signed and filed on December 20, 2011 is the final judgment in this case and the amended judgment entered on January 25, 2011 is a nullity. Defendants acknowledge that courts have the power to correct clerical errors in entered judgments, but argue the court here committed a "judicial error" that cannot be corrected by amendment. We disagree.

"A trial court has inherent power to set aside a judgment entered through its own inadvertence or improvidence, *such as a judgment which does not express the court's true intention* or where the court acted in ignorance of some material fact of record. [Citations.] 'But where the error is inherently judicial rather than clerical or inadvertent, the court has no power to amend its decision.' " (*Don v. Cruz* (1982) 131 Cal.App.3d 695, 703, italics added.)

"A clerical error in a judgment is an inadvertent one made by the court which cannot reasonably be attributed to the exercise of judicial consideration or discretion. [Citation.] 'The test is simply whether the challenged judgment was made or entered inadvertently (clerical error) or advertently (judicial error).' [Citation.] [¶] It is also settled that '[i]n determining whether an error is clerical or judicial, great weight should be placed on the declaration of the judge as to his intention in signing the [judgment].' [Citation.] The rationale for that rule [is that] '[w]here the error is made by the judge it is seldom clear from the record or other extrinsic evidence whether the error is judicial or clerical; i.e., whether (a) he knowingly rendered a judgment without realizing that it was bad in law (judicial error), or (b) inadvertently or by mistake signed findings or a judgment or order which he did not intend to constitute his decision. The issue is one of the judge's intent, and the best evidence is the judge's own statement, either express or implied from the order of correction. Hence, where the record permits an inference of clerical error, the judge's affidavit or declaration will be extremely persuasive on appeal.' " (*Bowden v. Green* (1982) 128 Cal.App.3d 65, 71.)

The trial court here issued a minute order explaining its decision to strike the December 20, 2011 judgment and sign the January 25, 2012 amended judgment as follows: "The proposed judgment submitted by [defendants] was signed on December 20, 2011. At the time of the signing, neither [Rodman's] proposed Amended Judgment, nor [defendants'] objections to the proposed Amended Judgment, was in the possession of the Judge. It appears both were filed, but never delivered to the file itself, before December 20, 2011. Believing, erroneously, that there was no dispute as to the proposed Judgment presented by [defendants], the Judgment was signed. The Court

13

apologizes for the confusion, and for the foolish belief that, in this case, there could ever be an undisputed order or Judgment. [¶] The court now strikes the judgment signed December 20, 2011, and signs the proposed Amended Judgment, provided by [Rodman] with modification."

Bearing in mind that in determining whether error in signing a judgment was clerical or judicial, the best evidence is the judge's own statement in the order of correction, (*Bowden v. Green*, *supra*, 128 Cal.App.3d at p. 71), we conclude the court's order clearly shows it erroneously signed the December 20, 2011 judgment through inadvertence, and that the erroneously signed judgment did not express its true intention regarding the expenses for which Blake sought 50 percent reimbursement from Rodman. Thus, the court's error in signing defendants' proposed judgment was clerical rather than judicial error. The court's explanation of why it signed defendants' proposed judgment, along with its decision to strike that judgment, shows that had the court received and considered both defendants' proposed judgment and Rodman's proposed amended judgment before signing either, it would have signed Rodman's proposed amended judgment (with the modification) and not defendants' proposed judgment. Accordingly, the court properly struck the December 20, 2011 judgment and entered the January 25, 2012 judgment.

Because the October 27, 2010 judgment was interlocutory and the court properly struck the December 20, 2011 as inadvertently entered, the only final and appealable judgment in this case is the January 25, 2012 amended judgment. We will hereinafter refer to the January 25, 2012 amended judgment simply as "the judgment" or "the final judgment."

14

## I. *Defendants' Objections to the Accounting*

### A. Calculation of mortgage contributions

Defendants contend the court erroneously adopted findings from Brinig's accounting report that are contrary to the court's verdict and judgment. Defendants' first claim of error is that the accounting report credited only a portion of Blake's entire mortgage/lease payments to her $700,000 share of the $1 million loan, contrary to the directive in the judgment that the entirety of her payments to [MP] were to be credited to her portion of the mortgage obligation. We agree that the accounting report failed to apply Blake's entire payments to her share of the mortgage loan as the judgment requires.

The court's verdict, the October 27, 2010 interlocutory judgment, and the final judgment all contain the following directive: "The accounting shall evaluate payments made by each side after considering that the $1,000,000.00 loan is divided with $700,000.00 being attributed to Blake, and $300,000.00 being attributed to Rodman. *All Mortgage/Lease payments made by Blake shall be accounted towards her portion of the loan.* Interest for each portion shall be attributed to the respective party." (Italics added.) As noted, the court also stated in its verdict: "[T]he 'lease payments' paid by [Sharlana to MP] were intended to be her mortgage payment for the lower part of the property. Indeed, were the evidence as argued by Rodman, *that she was only credited for a portion of such payments*, the 'deal' would be so one sided that this Court would likely rescind the entire contract, rather than reform it. In any event, Blake shall be credited with the *entirety of her payments to [MP]* towards her portion of the mortgage obligation." (Italics added.)

15

We construe the above-italicized language in the verdict, interlocutory judgment, and final judgment to require that the accounting credit 100 percent of any monthly mortgage/lease payment made by Blake to her $700,000 share of the mortgage loan, regardless of the amount of the total mortgage payment in any particular month. The accounting report shows that Brinig did not follow that directive. For example, from October 2002 through June 2003 and in a number of months in 2004, Blake made a $5,500 mortgage/lease payment to MP and Rodman paid $6,000 on the loan.[4] In his accounting, Brinig credited Blake with 70 percent of those $6,000 payments or $4,200 instead of $5,500, which amounts to almost 92 percent of a $6,000 loan payment. Brinig credited the remaining $1,800 of those payments to Rodman. Brinig's allocation of 70 percent of a loan payment to Blake in months where it appears from his tables that her monthly mortgage/lease payment covered over 90 percent of the loan payment indicates that Brinig was allocating a portion of her payments to Rodman's share of the loan or MP's expenses.[5]

---

[4] In July 2001, the parties agreed that Blake's monthly mortgage/lease payment would be $5,500, and Rodman's would be $2,000. The accounting report shows the total mortgage payment was $6,000 from August 2002 through March 2005. It then went up to $6,100 from April through August of 2005, after which it was $6,400 from September 2005 through December 2006. It then became $7,526 until February 2009 when it dropped to $5,971. In October 2010 it dropped to $5,826. The accounting shows four loan payments from January through June of 2011 (the end of the accounting period) in the amounts of $5,981, $4,500, $1,345, and $5,971.

[5] Brinig explained in his report that loan payments were allocated 70 percent to Blake and 30 percent to Rodman in accordance with the 70/30 division specified by the interlocutory judgment. He further explained that "where there was insufficient capital in either member's capital account to cover the [member's] respective 70% or 30% portion of the loan payment, the insufficiency was covered by the other member . . . ."

16

Either way, applying less than 100 percent of Blake's mortgage/lease payments to her $700,000 share of the mortgage loan was contrary to the express directive in the interlocutory judgment and final judgment.[6]

We recognize that during the July 14, 2011 hearing, the court gave Brinig oral instructions that are inconsistent with the express language in the judgment requiring all mortgage/lease payments by Blake to be accounted toward her portion of the loan. At the beginning of the hearing Brinig asked the court if he should apply all of Blake's rental payments to the mortgage, or use a portion of them for ongoing expenses. The court stated it would defer answering that question until after the parties had questioned Brinig. Brinig then asked: "If [Blake] has more money than her 70 percent share of the mortgage payment on the day of the mortgage payment—and let's just say the mortgage payment is [$10,000]. .

_____

[6]     The court held a hearing on July 14, 2011 to provide the parties and the court an opportunity to question Brinig and provide Brinig the opportunity to obtain clarifying instructions from the court regarding the accounting. The court issued an order after that hearing in which it stated: "The court orders the mortgage payment to be split 70/30 with Ms. Blake making her monthly payments in the amount of 70% of the mortgage payment and Mr. Rodman paying 30% of the mortgage payment. *All of Ms. Blake's payments will be applied toward her $700,000 mortgage obligation and are to be treated as mortgage payments not 'lease' payments for accounting and tax purposes.* Mr. Rodman and Ms. Blake are ordered to pay [MP's] expenses as follows pursuant to paragraph 8 of the [October 27, 2010] Judgment: property taxes 50/50; legal expenses 50/50; accounting and bookkeeping 50/50; Ms. Blake pay 100% of insurance; and costs associated with the subdivision are 50/50[.]" (Italics added.)
This language requires Blake's monthly mortgage payment to be at least 70 percent of the total mortgage payment, but does require the amount of any payment in excess of 70 percent to be applied to expenses. To the extent the order can be construed as allowing portions of Blake's payments in excess of 70 percent of the loan payment to be applied toward MP's expenses instead of Blake's $700,000 mortgage obligation, it is inconsistent with the verdict and the interlocutory and final judgments.

. . But if it's ten grand and she has ten grand in her capital account, does she get more credit for that mortgage payment than her 70 percent share?"

Later in the hearing the court stated: "So I'm going to instruct you [that Blake's mortgage/lease payments] should be applied first to the loan, right? . . . But to the extent on any month there's an additional amount in excess . . . , that should be applied to the existing expense, keeping in mind the Court reassessed the expenses. That's why they are not called for in the agreement, because I went back and said you have to pay half of this, this percentage [of] that." The court illustrated, "Let's say $10,000 was the amount of the payment, and she paid $7,000. [$]7,000 would go to the loan. During some month [the payment] goes down to $9,000. But she still pays $7,000. That amount over her 70 percent share goes to expenses."

Thus, the court instructed Brinig that regardless of the amount Blake paid in a given month, he should never apply more of her payment to that month's loan payment than her 70 percent share, and if there were money left after applying the loan payment, it was to be applied to her share of expenses. To the extent her balance left over from her loan payments was insufficient to meet her share of expenses, it would become a negative balance to be paid from her next lease payment, which could result in that lease payment being insufficient to cover her 70 percent of the next mortgage payment.

The court's oral directives explain why Brinig did not apply the entirety of Blake's $5,500 payments to her share of the loan when the loan payments were $6,000, but rather applied only 70 percent of $6,000 or $4,200 to her share of the loan. However, it is unclear from Brinig's amortization tables or elsewhere in his report to what extent Brinig applied the

18

remaining $1,300 of her payments to MP expenses versus Rodman's share of the monthly

loan payment. In any event, the court's oral directive is inconsistent with the language in the

verdict and the interlocutory and final judgments that clearly requires the accounting to apply

the *entire* amount of Blake's mortgage/lease payments to her share of the mortgage loan,

regardless of whether a payment is greater or less than 70 percent of the total payment. The

final judgment controls over the court's oral directive (*In re Marcus* (2006) 138 Cal.App.4th

1009, 1015-1016; *Jespersen v. Zubiate-Beauchamp* (2003) 114 Cal.App.4th 624, 633), and

to the extent the court's written order after the July 14, 2011 hearing is inconsistent with the

final judgment, the judgment controls over the inconsistent prior order. (*Maywood Mutual*

*Water Co. v. County of Los Angeles* (1970) 12 Cal.App.3d 957, 960 [trial court's formal

judgment generally may not be impeached by a prior inconsistent order]; *Oldis v. La Societe*

*Francaise De Bienfaisance Mutuelle* (1955) 130 Cal.App.2d 461, 472 [no antecedent

expression of the trial court can restrict its absolute power to render a final decision].)

In accordance with the court's verdict and interlocutory and final judgments, the

accounting should have applied the entirety of Blake's mortgage/lease payments to her share

of the loan, and no part of those payments should have been applied in the accounting toward

her expenses or Rodman's share of the mortgage loan. The accounting findings in the

judgment will have to be modified accordingly, with the result being that under the modified

judgment, Blake will owe less on her share of the loan and Rodman may owe more to the

extent portions of Blake's mortgage/lease payments were credited to his share of the loan.[7]

Blake will owe more in expenses to the extent the accounting applied any part of her mortgage/lease payments to her share of MP's expenses.

B.  Interest on expenses

Defendants contend Brinig's report improperly charges her approximately $140,000 in interest on expenses Rodman paid from the MP account.  How defendants view the accounting as charging interest on expenses and how they arrived at the amount of $140,000 is difficult to fathom.  Defendants argue the interest amount of "$140,000 is figured as" the approximate difference between the $619,000 Brinig found Blake owed on the mortgage in his final report and $479,025—the amount they contend Brinig should have found based on an un-final draft amortization he prepared before submitting his final report.  In that draft, Brinig applied Blake's entire mortgage lease payments to her share of the loan.  The unarticulated analysis in defendants' argument appears to be that interest on Blake's share of the mortgage loan that was not reduced because of the accounting's failure to credit her mortgage payments entirely to her share of the mortgage is equivalent to interest charged on her share of the expenses.

---

[7]     Brinig testified that if Blake's payment of her share of expenses is deferred until the dissolution of MP and "fronted by Mr. Rodman over the life of the deal, . . . Rodman would owe about $120,000 more than he otherwise would owe . . . .  Because that would mean that Rodman had way less money in the deal to make his share of the mortgage payments.  So when you carry that logic over to the amortization schedule, Rodman was paying expenses, not mortgage payments, so he owes about $120,000 more of the mortgage."

Rodman's counsel raised the issue of interest on expenses in a letter to Brinig dated June 29, 2011. Rodman's counsel proposed two alternatives for Brinig to use in accounting for expenses: "One choice (in your model) is that 100% of their respective payments are first used to amortize each party's respective share of the loan amortization *before* taking into consideration proportionate expenses *that previously occurred*. Then, add back the respective amounts due for both parties at the end of the calculation. [¶] The alternative choice (in your model) is that each party is first charged with their proportionate expenses *as they occurred*, and the remaining net payments made by the parties are calculated towards their respective share of the loan amortization *after* such expenses are paid as they were incurred." Brinig used the second alternative with the court's approval. However, there is nothing in the record, including Brinig's final report, or the parties' briefs that supports defendants' assumption that the difference between the amount Blake owes on the mortgage loan under the final accounting report and judgment and what she would owe if Brinig had applied the entirety of her mortgage/lease payments to her share of the loan is properly viewed as interest charged on her share of MP's expenses.[8]

_____

[8]     Defendants in their opening brief assert that the court approved "Rodman's proposal that Blake be charged interest on expenses Rodman had paid through the LLC account, ostensibly for the LLC's benefit." Defendants' record citation for that assertion is to a discussion between Brinig, defendants' counsel, and the court about how Brinig should handle MP's expenses. Defendants' counsel stated Blake "has a whole bunch of expenses that she was paying outside this LLC account. So how does that figure into it as she's paying loans with this amortization schedule?" Brinig stated, "Just so you know, I said in one of my letters I will list them. They will, in my view, never be an integral part of [MP]. [When the court sees] the list, [it] may decide to do something with them. I don't think they will ever tie in to [MP]. I'm trying to give you a little bit of both, Ms. Allard. I don't have a problem listing [the expenses], and I don't have a problem telling you how much they add up to." The

21

In any event, because defendants' contention that Blake was improperly charged interest on her share of expenses is based on the failure of the accounting to apply the entire amount of lease/mortgage payments to her share of the mortgage loan, the issue is moot in light of our conclusion that no part of Blake's mortgage lease payments are to be applied toward expenses. However, that conclusion raises the question whether Blake should be charged predissolution interest on her share of expenses in the judgment on remand.[9] The answer is no.

"[I]n a partnership dissolution the amount due partners does not become settled or determined until the account is stated by the trial court at the end of the trial." (*Mashon v. Haddock* (1961) 190 Cal.App.2d 151, 180.) Therefore, "[t]he general rule has always been that except where there has been a fraudulent retention or an improper application of money of a partnership, it is not the practice of the courts to charge a partner with interest on money

---

court then said to defendants' counsel, "*Ultimately—again, sounds like you have to come back to me and say we should get credit . . . for X, Y, and Z.*" (Italics added.) Defendants' counsel said she would like to be heard on that point. The court told her she "would be reserving [on that issue]," and that the matter would have to be addressed after the accounting was completed.

Defendants cite the court's italicized statement as showing that the court adopted Rodman's proposal to charge interest on expenses. However, the court's statement, whether read in isolation or in context of the discussion in which it was made, has nothing to do with charging interest on expenses.

[9] Rodman's respondent's brief does not address the issue of whether the accounting did or should have charged interest on Blake's share of MP's expenses. However, in Rodman's counsel's June 2011 letter to Brinig, counsel argued: "The allocation of gross or net payments to the amortization of the total loan does not require one party to front the non-mortgage related costs before the other party contributes their share of such expenses. We believe it would be unfair for one party or the other to have to uniquely advanced expenses in a calculation, and in effect be reimbursed at the end, unless interest at the same rate of the mortgage is credited to that party."

in his hands after dissolution, and under ordinary circumstances a partner is not charged with interest on sums drawn out by him or advanced to him." (*Ibid.*; *Burge v. Michael* (1963) 213 Cal.App.2d 780, 790 ["A partner or joint adventurer is not entitled to interest on his capital contribution prior to an accounting unless it is expressly so agreed among the partners or joint adventurers."]; *Luchs v. Ormsby* (1959) 171 Cal.App.2d 377, 388; [as a general rule interest is not allowable on unascertained balances remaining in one partner's hands after dissolution of the firm]; *Freese v. Smith* (1952) 114 Cal.App.2d 283, 290 [same].) We see no reason this general rule, and other principles applicable to partnership dissolution, should not apply equally in an action for dissolution and accounting of a limited liability company. Because there is no issue in this case regarding any fraudulent retention or improper application of MP's money by Blake, Rodman is not entitled to interest on any portion of Blake's share of MP's expenses that he advanced before the accounting.

C. Liability for Rodman's capital contributions

Defendants contend the judgment erroneously adopted an accounting method that charged Blake with liability for Rodman's capital contributions. Specifically, defendants complain that the accounting improperly applied portions of Blake's lease/mortgage payments to Rodman's share of the mortgage loan, essentially rehashing their first challenge to the accounting. Defendants cite *Jones v. Wagner* (2001) 90 Cal.App.4th 466 (*Jones*) for the proposition that absent an agreement otherwise, a partner has no legal or equitable duty to make additional partnership contributions upon another partner's failure to make contributions he or she owes under the partnership agreement. (*Id.* at pp. 472-473.) Defendants contend the side agreement plainly contemplates independent contribution

obligations, and the verdict and judgment require all of Blake's payments to MP to be credited toward "her portion of the mortgage obligation."  Thus, defendants argue, there is no legal basis for applying Blake's contributions to MP to make up for Rodman's capital deficits.

Because we have determined that the accounting erroneously applied portions of Blake's lease payments to Rodman's share of the mortgage loan contrary to the directive in the verdict and judgment that they be applied entirely to her share of the loan, we need not consider defendants' additional argument on that point based on *Jones.*

## II.  *Blake's Obligation to Pay Rent*

As noted, the court granted Rodman's motion to charge Blake the reasonable value of her occupancy of the property.  Accordingly, the final judgment states:  "The Court further determines and finds the reasonable rental value of the 10 acres of real property owned by [MP] is $5,500 per month.  [¶] . . . As of January 1, 2012, Ms. Blake is ordered to pay Mr. Rodman $1,650.00 (30% of the reasonable rental value) each month for her occupancy of the real property owned by [MP] or any portion of the entire 10 acres."  The judgment orders Blake to pay the monthly rent of $1,650.00 until she "vacates the property, the property is sold or is legally divided."

Defendants contend the court's order that Blake pay rent to Rodman is unsupported by the evidence because there is no evidence that Rodman could not use the upper three acres of raw land pending subdivision.  Additionally, defendants cite *Hunter v. Schultz* (1966) 240 Cal.App.2d 24, 30-31 (*Hunter*) for the proposition that, in defendants' words, "[a]ssessment of rental value is authorized by law as a **defensive offset only** for contribution and is not

24

available as it was ordered by the court as a prospective remedy with no reference to contributions or offsets for the improvements on the property paid for by Ms. Blake." Rodman does not address this issue in his respondent's brief.

As a general rule, a cotenant out of possession of real property has no right against another cotenant in exclusive possession of the property to recover rental value for occupancy and use of the property, because each cotenant has the right to occupy the property. (*Teixeira v. Verissimo* (1966) 239 Cal.App.2d 147, 155; *Brunscher v. Reagh* (1958) 164 Cal.App.2d 174, 176-177.) However, there are three exceptions to the general rule: (1) where there is an agreement between the cotenants to share rents and profits (*Teixeira*, *supra*, 239 Cal.App.2d at p. 155; *Black v. Black* (1949) 91 Cal.App.2d 328, 332); (2) where the cotenant in possession has ousted the cotenant out of possession (*Estate of Hughes*, *supra*, 5 Cal.App.4th 1607, 1611; *Teixeira*, *supra*, 239 Cal.App.2d at p. 155); or (3) where the cotenant in possession demands contribution for expenditures on behalf of the cotenancy, the court, as a matter of equity, may award the cotenant out of possession the reasonable value of the other cotenant's use of the property as an offset against the contribution for expenditures. (*Hunter*, *supra*, 240 Cal.App.2d at pp. 31-32; *In re Fazzio* (Bnkr. E.D.Cal. 1995) 180 B.R. 263, 269.)

As equal members of MP, which under the judgment is not dissolved until the subdivision of the property is complete, Rodman and Blake are cotenants of the property until it is subdivided with an equal right to occupy the property, absent an agreement to the contrary. (*Tom v. City and County of San Francisco* (2004) 120 Cal.App.4th 674, 677.) In his motion to charge Blake the reasonable value of her occupancy of the property, Rodman

25

cited Civil Code section 843 subdivisions (a), (c), and (d) as addressing, in his words, "when one cotenant or owner seeks to require another cotenant or owner to pay for the reasonable value of the [other] cotenant's use of the property." Civil Code section 843, subdivision (a) provides that a tenant out of possession may establish ouster from a tenant in possession, and subdivision (c) addresses the availability of a claim for damages for an ouster. Subdivision (d) authorizes the cotenants to make "an agreement as to the right of possession among the cotenants, the payment of reasonable rental value in lieu of possession, or any other terms that may be appropriate." Rodman's citation to this statute indicates he was aware of the general rule precluding him from recovering rent from his cotenant Blake and the "ouster" and "agreement" exceptions to the rule.

Although Civil Code section 843 provides a statutory mechanism for establishing ouster, ouster may also be established under common law principles. " 'An ouster, in the law of tenancy in common, is the wrongful dispossession or exclusion by one tenant of his cotenant or cotenants from the common property of which they are entitled to possession.' [Citation.] Whether there has been an ouster is a legal question." (*Estate of Hughes*, *supra*, 5 Cal.App.4th at p. 1612.) "[A]t common law ouster was established by a cotenant's unambiguous conduct manifesting an intent to exclude another cotenant from gaining or sharing possession of jointly owned property." (*Id.*, at p. 1614.) Thus, "an ouster is 'proved by acts of an adverse character, such as claiming the whole for himself, denying the title of his companion, or *refusing to permit him to enter*. Actual or constructive possession of the ousted tenant in common at the time of the ouster is not necessary. [Citations.]' [Citation.] '[A]n action by a tenant in common against his cotenant to be admitted into the possession, a

denial in the answer of the plaintiff's title and right of entry is equivalent to an ouster.' " (*Id*., at p. 1615, italics added, original italics omitted.)  Thus, an "ouster may occur in a peaceful, non-aggressive manner through lawful means . . . ." (*Ibid.*)  "Whenever an ouster occurs the rental obligation accrues.  Consequently the manner of its accrual is irrelevant provided the cotenant in possession reasonably understands the effect of his or her behavior."  (*Ibid.*)

The court made no express findings in its order granting Rodman's motion to charge Blake for her occupancy of the property.  Consequently, "we infer that it made every implied factual finding necessary to support its order and review those implied findings for substantial evidence."  (*Chin v. Advanced Fresh Concepts Franchise Corp.* (2011) 194 Cal.App.4th 704, 708.)  We conclude there was sufficient evidence to support the implied finding that Blake ousted Rodman from the property and Rodman was therefore entitled to recover reasonable rental value for Blake's exclusive use of the property.

In its order granting Rodman's motion the court stated it "fully considered . . . the evidence presented . . . ."  Rodman filed a declaration in support of his motion to charge Blake rent in which he stated:  "I have never been allowed to use the property or occupy the property in any manner.  In fact, Ms. Blake threatened to call her 'security' on me when I attempted to visit the property in 2010, even though my attorneys provided her attorney notice of my intended visit.  I have been precluded from using the property in any regard.  I am not allowed to even visit the property, nor reside on the property, even though Mr. Brinig's report demonstrates I have substantially paid my obligation to [MP] . . . ."  Rodman's reply to defendants' opposition to his motion included a declaration in which he similarly averred:  "I have been unable to even visit the property since 2008, even with my attorneys

27

notifying Ms. Blake of my intent to visit the property for the purpose of evaluating the 3 upper acres.  On one specific instance, Ms. Blake threatened to call her 'security' team if I entered the property and she verbally told me and my guest to get off the property."

Based on these averments in Rodman's declarations, the court could reasonably find that Blake ousted Rodman from possession of the property by refusing to permit him to enter.  Accordingly, the court reasonably charged Blake rent for her occupation of the property until the property is subdivided, and reasonably limited the amount of rent to 30 percent of the entire property's reasonable rental value based on the percentage of the property Rodman will own after subdivision.

III. *Denial of Defendants' Motions to Reopen Evidence and Set Aside the Accounting*

Defendants contend the court abused its discretion by denying their motion to set aside the accounting after denying their motion to reopen evidence relevant to dissolution. They argue that taken together, the orders denying these motions deprived Blake of due process because no cause of action for dissolution was litigated at trial; therefore, Blake did not have an opportunity at trial to offer evidence relevant to dissolution, such as evidence concerning contributions and disbursements by Blake and Rodman and allocation of tax benefits.

Defendants complain that the court denied their motion to reopen on the premise their evidence relevant to dissolution would be considered by Brinig, and Brinig would make the relevant findings in the accounting.  Defendants contend they were forced to move to set aside the accounting findings because Brinig did not make requested factual findings.  They argue that the court should have either granted their motion to reopen evidence or, in ruling

on their motion to set aside the accounting findings, ordered Brinig to make their requested findings or ruled itself on the requested findings.  Rodman ignores this issue except to note that he and defendants agreed after trial to include dissolution as a remedy, and that defendants filed two substantially identical motions that challenged the accounting findings—a "motion for adjustments to accounting findings," which the court denied on October 14, 2011, and a "motion to set aside accounting findings," which the court denied on December 5, 2011.

"Trial courts have broad discretion in deciding whether to reopen the evidence. [Citation.]  We review a court's denial of a motion to reopen evidence for an abuse of discretion.  [Citation.]  The appropriate test for abuse of discretion is whether the trial court's decision exceeded the bounds of reason."  (*Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 208-209.)  Here, it was not an abuse of discretion to deny the motion to reopen because the court reasonably concluded that factual issues regarding the dissolution and accounting could be adequately adjudicated through the accounting process and the opportunity to challenge the accounting findings.  Accordingly, the key issue regarding defendants' assignment of error is whether the court erred in denying defendants' motion to set aside the accounting findings.

In determining the rights of the parties in an action for a dissolution of a partnership, an accounting between the partners, and settlement of the partnership's affairs, the trial court applies equitable principles and its decision is reviewed for abuse of discretion.  (*Bates v. McTammany* (1938) 10 Cal.2d 697, 700; *Heller v. Pillsbury Madison & Sutro* (1996) 50

Cal.App.4th 1367, 1392.)  Accordingly, we review the court's decision to deny defendants' motion to set aside the accounting findings for abuse of discretion.

We conclude the court's denial of defendants' motion to set aside the accounting findings was neither an abuse of discretion nor a denial of Blake's right to due process.  In their opening brief, defendants argue the denial of their motion to set aside the accounting findings was prejudicial because the accounting accepted Rodman's claimed expenses as legitimate and applied portions of Blake's lease/mortgage payments to expenses and Rodman's share of the mortgage instead of applying the entire payments to Blake's share of the mortgage.  The latter contention is moot in light of our conclusion that the accounting and judgment must be corrected to apply Blake's entire mortgage lease payments to her share of the mortgage.

Regarding the accounting's acceptance of Rodman's claimed expenses, the expense item defendants objected to in their motion to set aside the accounting findings was the attorney fees paid to attorney Rick Elliot in connection with a lawsuit against MP filed by the O'Briens (the O'Brien action), who were neighboring property owners.  The O'Brien's complaint included claims for trespass, encroachment, nuisance, and declaratory relief, alleging, among other things, that Blake/Sharlana's business violated zoning ordinances and caused damage to the O'Briens's property.  Defendants claimed Elliot had a conflict of interest and that Rodman ignored Elliot's advice to tender a claim to MP's insurance company and told Blake he would personally cover Elliot's fees.

As Rodman pointed out in his opposition to defendants' motion, the issues of Elliot's tender advice and MP's payment of his fees were litigated at trial,[10] after which the court ruled in the verdict and judgment that legal expenses were to be divided equally between Rodman and Blake with no reference to any issue regarding Elliot's fees. Thus, the court impliedly found that Elliot's fees were properly treated as an expense of MP. We will not disturb the judgment based on the court's denial of defendants' motion to set aside the accounting findings.

## IV. *Findings Not Expressly Included in the Judgment*

Defendants contend the judgment erroneously omits factual findings necessary to an equitable settlement upon dissolution and full determination of the parties' claims. Before addressing the specific findings that defendants claim were omitted from the judgment, we note that apparently there was no request for a statement of decision under Code of Civil Procedure, section 632 in this case, perhaps because the trial court employed the questionable procedure of issuing a "Verdict After Court Trial."[11] "A party's failure to

---

[10] Rodman and Blake were questioned at trial about Elliot's representation and MP's payment of his fees.

[11] We are aware of no authority for a trial court to render a "verdict" after a court trial. In common parlance, a verdict is rendered by a *jury*, not a court sitting as the trier of fact. (*Howser v. Chicago Great Western R. Co.* (Mo. 1928) 5 S.W.2d 59, 64-65 ["The word or term 'verdict,' as used in legal phraseology, and in common parlance as well, is understood generally to mean the pronouncement, finding and determination of a jury upon an issue of fact as between two opposing and contending parties."]; see Code Civ. Proc., §§ 613-630. As noted, the court's verdict in this case reads like a statement of decision. We disapprove the practice of rendering a "verdict" in lieu of a statement of decision after a court trial to the extent it discourages parties from invoking the procedure for obtaining a statement of decision under Code of Civil Procedure sections 632 and 634.

request a statement of decision when one is available has two consequences. First, the party waives any objection to the trial court's failure to make all findings necessary to support its decision. Second, the appellate court applies the doctrine of implied findings and presumes the trial court made all necessary findings supported by substantial evidence." (*Acquire II, Ltd. v. Colton Real Estate Group* (2013) 213 Cal.App.4th 959, 970.

A. Blake's capital contribution brought to MP

Blake contends the judgment omits any factual findings on her request to the trial court that she be credited with contributing approximately $400,000 of equity to MP, corresponding to grading and other improvements she put on the property to render it suitable for her horse business. She asserts that her improvements to the property increased its appraised value from $590,000 to $1,400,000.

In its verdict and judgments, the court found that "all improvements upon, and fixtures within the subject real estate are the exclusive property of Defendants Blake and Sharlana Farms . . . ." The verdict additionally states: "There is no reasonable argument or evidence that the stables, barns, corrals, etc., belong to [MP]." During an ex parte hearing in December 2010 concerning the then ongoing accounting, Rodman's counsel objected to Blake's unlitigated claim that $177,000 she spent for improvements and a mobile home on the property were MP's expenses. The court stated, "I made a finding in the judgment that all of the improvements on the property were Ms. Blake's property. So those wouldn't, in my mind, be part of the accounting."

32

By defendants' own argument, the increase in value of the property from $590,000 to $1,400,000 was due to her improvements to the property. Defendants requested credit for $400,000 in equity corresponding to those improvements in their motion to set aside the accounting findings. Based on the court's denial of that motion, its finding that the improvements were entirely Blake's property, and its observation that because the improvements were Blake's property, the money she spent on them should not be part of the accounting, we conclude the court impliedly and reasonably found that the $400,000 in equity attributable to Blake's improvements was exclusively an asset of Blake and Sharlana and not a capital contribution to MP. The judgment is not defective for failing to expressly make that finding.

B. Blake's claimed expenses

Defendants contend the court erred by failing to include in the judgment findings on Blake's request to have her claimed MP expenses incorporated into the accounting. Brinig simply listed Blake's claimed expenses and deferred to the court to decide whether they were properly included in the accounting. Defendants request that we remand and direct the trial court to modify the judgment by crediting Blake with her claimed expenses, which she lists in her opening brief.

We conclude the court impliedly found Blake's claimed expenses were personal to her and Sharlana and were not expenses of MP. The judgment that the court mistakenly signed on December 20, 2011 and later struck included a provision requiring Rodman to reimburse Blake for 50 percent of the expenses Blake claimed she paid for the benefit of MP. The fact that the final judgment the court ultimately entered on January 25, 2012 omitted any

33

provision regarding Blake's claimed expenses shows the court decided those expenses were not properly included in the accounting and judgment as expenses of MP.

Blake's claimed expenses included attorney fees she paid in the O'Brien litigation for attorney Don Vaughn, who represented her and Sharlana in the O'Brien litigation, and the cost of improvements she made to the property. In his opposition to defendants' motion to set aside the accounting findings, Rodman contended Vaughn represented defendants and not MP, and that all of the attorney fees and legal expenses incurred to defend the O'Brien action were due to Blake's business activities and did not relate to any conduct by Rodman or MP. In a declaration he noted that neither he nor MP had been partners in Sharlana or received any of Sharlana's revenues or profits. He also correctly pointed out that Blake did not claim that Vaughn's fees and her other claimed expenses were expenses of MP until after trial. Based on these circumstances, the court could reasonably find Blake's claimed expenses were personal to her and Sharlana and were not expenses of MP. Accordingly, we deny defendants' request to modify the judgment by crediting Blake with her claimed expenses.

C. Allocation of tax benefits from improvements on the property

Defendants contend the judgment fails to reallocate tax losses as the court directed in its verdict. In relevant part, the verdict states: "The court is troubled by the apparent inconsistency between the treatment of personal property located on the real estate, and the tax benefits which it provides. There is no reasonable argument or evidence that the stables, barns, corrals, etc. belong to [MP] . . . . The evidence is persuasive, and the Court finds, that all improvements upon, and fixtures within the subject real estate are the exclusive property of Defendants Blake and Sharlana Farms. However, the documents submitted to the Court

34

indicate that the tax benefits of those items flowed to [MP] and were then divided between Rodman and Blake equally. In essence, the evidence supports that Blake should have benefitted from the depreciation of the improvements to the property, most of which predate the formation of [MP]. This will need to be reconciled during the Accounting."

The verdict does not clearly direct reallocation of tax losses; it reflects that when the court rendered the verdict, which was before the accounting was undertaken, the court was of the view that the tax losses could and should be reallocated in the accounting. However, at a pre-accounting hearing in October 2010, defendants' present counsel told the court that Blake had paid her own accountant to look at the case and the accountant reported, in Blake's counsel's words, that "these tax losses, the valuation, everything, it's all a fraud."[12] Blake's accountant recommended Blake have no part of the false valuation of the property to share in the tax loss. Blake's counsel stated: "The truth was [Rodman] gave himself 100 percent of her tax losses. The court wants it split 50/50. [Blake is] now in the position where she doesn't want to take 50 percent of a fraudulent tax loss[.]"

During the July 14, 2011 hearing, Brinig testified under questioning by Blake's counsel that he was having problems with trying to restructure or redo the tax allocations as the verdict requested. He testified, "I am not capable of correcting the tax treatment of [MP]" and he did not "think that anyone could correct [MP's] reporting. So it's kind of a

---

12      Presumably, the "fraud" that Blake's counsel was referring to was related to the following statement in the court's verdict: "Another anomaly was the decision, at Rodman's direction, to show the purchase price [of the property] as $700,000.00 for the entire deal. There was no reasonable explanation for doing so, leaving the Court to surmise the purpose was to defraud the State and County of San Diego Tax Collectors. This reflects poorly on both parties to the transaction."

mess. I'm not able to sit here and perfectly summarize why it's a mess. But—and at some other level, it's probably beyond my capability to fix."

Brinig later suggested that if a court were to decide Rodman had unfairly realized tax benefit from the depreciation of the improvements, it could be reasoned: " 'Okay, he got [deductions] in these many years for this much.' And then somebody could figure out some economic consequence or theoretical benefit to him of that possibly. And let's say it came out to be $30,000. . . . [T]he court could then say, 'You know what, she should have gotten half of it. Pay her 15.' But the other question is, are they the same to each person? Meaning, he might have a lot of income; so therefore, a deduction for him is worth something. The other hypothetical person might not. So a deduction for them isn't worth it. There's all that kind of stuff that I can't begin to process." Thus, Brinig recognized it would be extremely difficult to determine, in hindsight, how much Blake would have benefitted over the years if she had taken half of the tax deductions that Rodman claimed, because the amount of tax savings would be different for each party due to their differing income and other factors.

In September 2011, defendants filed a "Motion for Court Order Regarding [MP] Tax Treatment," in which they claimed that tax forms prepared for Rodman and his wife showed that beginning in 2001, Rodman took 100% of the tax losses for the improvements Blake made to the property. They requested an order that "all future preparation of [MP] taxes . . . be prepared in light of the verdict[,] which states that her payments are to be treated as mortgage payments not lease payments. *Additionally Ms. Blake requests court orders with respect to the tax loss allocations ordered in the verdict."* (Italics added.) Defendants

argued that if that the tax loss reallocation referenced in the verdict cannot be accomplished as Brinig essentially testified, Blake should be credited in the accounting with an initial capital contribution of $350,000 corresponding to the improvements she made and on which Rodman took the tax loses.

In opposition to defendants' motion, Rodman argued the treatment of tax losses had not harmed Blake because there is no cash value to any depreciation until the property is sold. Rodman represented that Blake had been "told repeatedly by [MP's accountant] that the tax losses would only *potentially* convert to an actual cash value when the property is sold. Until that time there is no value to tax losses [because] they are 'paper' losses. [¶] Due to the passive loss rules, . . . a cash benefit resulting from any losses or depreciation can only be potentially converted when [MP] is dissolved and [the] property sold" Thus, Rodman argued, there was no legal basis to deem the tax losses to be equivalent to a $350,000 capital contribution. Rodman asserted that the treatment of MP's tax losses had been litigated at trial, stating he testified that Blake did not benefit from the tax losses because she did not file personal tax returns, and that she and Rodman had agreed Rodman would take the tax benefits until such time as it would benefit Blake to receive the value of the depreciation.[13]

_____

[13]    We did not find such extensive testimony about MP's treatment of the tax losses in the reporter's transcript of the trial. On direct examination, Rodman testified that before MP was created and purchased the property, he proposed taking 100 percent of the tax losses on the property because his income was higher than Blake's, and they could use "some of my tax savings to help." However, Rodman's counsel averred in a declaration in opposition to defendants' "tax treatment" motion that "we were informed through discovery that Ms. Blake had not filed personal tax returns for many years . . . . Further, we were informed by [MP's accountant] that he understood there to be an agreement whereby since Mr. Rodman was the

37

The court issued the following order denying defendants' motion: "The Motion of Defendant Blake for [MP] Accounting and for Preparation of [MP] Taxes in Compliance With Trial Verdict, is denied. The issue raised is a matter between the parties and the IRS." Thus, although the court expressed the view in its verdict that the tax benefits from Blake/Sharlana's improvements should have gone entirely to Blake/Sharlana instead of to MP to be realized equally by Rodman and Blake, the court ultimately determined it was not feasible to put a monetary value on the tax benefits Blake would have realized if she or Sharlana, rather than MP or Rodman, had taken all of the depreciation benefits on tax returns over the years of MP's existence. Based on Brinig's testimony and Rodman's opposition to defendants' "tax treatment" motion, the court reasonably decided that the tax reallocation referenced in its verdict was not reasonably susceptible of resolution through the judicial accounting. Accordingly, the court did not err in omitting tax benefit reallocation from the final judgment.

*only* party that would have benefitted from the deduction, that Mr. Rodman received 100% of the deduction."

Rodman stated in his opposing declaration: "From 2001 forward, I was told by Ms. Blake that she would not and could not benefit annually from the tax losses or depreciation because of her individual tax status. I did not have personal knowledge of her precise personal tax plans or any information regarding her personal tax returns, other than her telling me that in certain years she had not filed her personal returns. Accordingly, it was agreed between Ms. Blake and me that until Ms. Blake could actually benefit from the depreciation or tax losses, I would receive the tax losses."

D.  Rodman's withdrawal of $70,000 from escrow.

Defendants complain that the judgment fails to make factual findings about the $70,000 Rodman withdrew from an escrow account after he arranged for MP to purchase the property with the $1 million loan.  The court in its verdict found that the parties' original deal was for Rodman to purchase three acres of the property for $375,000, and that Rodman deposited $75,000 in escrow with the intent to obtain a loan for the remaining $300,000.  The court found Rodman later withdrew $70,000 from the escrow account.  Regarding that withdrawal, the court stated:  "[Rodman's] explanation [of the withdrawal] was not credible, and there was no documented notice to Blake.  However, Blake's testimony that she never knew it was gone until the present litigation was not very persuasive either."

When asked at trial why he withdrew most of his $75,000 deposit from escrow, Rodman answered, "Because it was not needed to be there because of the way the financing worked out."  During the July 14, 2011 hearing, the court referred to Rodman's $75,000 escrow deposit as follows:  "I found there to be a million dollar loan, even though clearly when we tried the case, the amount of the loan was 75,000 [*sic*].[14]  So the $75,000 issue is gone.  The $300,000 issue is gone.  There's a million dollar loan.  It's split 70/30.  That's the intent of the Court."  Thus, the court impliedly found, in accordance with Rodman's testimony, that Rodman was entitled to withdraw his $75,000 from escrow because the terms of the parties' deal had changed and it was no longer needed under the new agreement,

---

14    The court presumably meant to refer to the $300,000 loan Rodman tried to obtain to cover the remainder of the $375,000 purchase price for the upper three acres of the property under the parties' original deal.

39

whereby $300,000 of the $1 million loan used for MP's purchase of the property covered Rodman's acquisition of the property's upper three acres. It was not reversible error to omit an express finding to that effect in the judgment.

### E. Blake's breach of fiduciary duty claim

Defendants contend the court failed to make necessary findings on Blake's cause of action against Rodman for breach of fiduciary duty. Defendants acknowledge that the court found Rodman was not a fiduciary to Blake when they entered into their business relationship, "but became one once they agreed to be in business together." However, they argue the court should have made findings on whether Rodman breached his fiduciary duties to Blake after they entered into the OA. In support of the judgment, we imply the finding that none of Rodman's conduct after he and Blake formed MP amounted to a breach of fiduciary duty.

Having expressly found that Rodman was a fiduciary to Blake after they entered into the OA, the court's failure to address whether Rodman breached his fiduciary duties implies that the court found there was no breach after the parties formed MP. In their opening brief, defendants contend Rodman breached his fiduciary duties to Blake by the following conduct: (1) deceiving Blake as to the fate of the $70,000 he secretly withdrew from escrow; (2) using Blake's mortgage payments to pay down the loan but crediting them toward his own mortgage obligation and expenses; (3) creating on MP's books his $300,000 loan obligation to MP and crediting his payment of MP expenses toward that obligation; (4) paying Elliot's attorney fees through MP's account; and (5) taking for himself the tax benefits from the depreciation of Blake/Sharlana's improvements on the property without Blake's knowledge

40

or consent. We have discussed all of this conduct above and are satisfied that the court could reasonably find none of it constitutes a breach of fiduciary duty.

There was evidence that Rodman's withdrawal of $70,000 from escrow was proper in light of the parties' ultimate financing arrangement and that Blake was aware of the withdrawal, as the court suggested in its verdict. As we discussed above, Brinig in the accounting improperly credited portions of Blake's lease mortgage payments toward MP's expenses and Rodman's share of the mortgage contrary to the express directive of the verdict and judgment, but did so with the court's erroneous approval, not because of any breach of fiduciary duty on Rodman's part. Nor was it a breach of fiduciary duty for MP's books to reflect Rodman's $300,000 mortgage obligation. The extent to which Rodman's payments into MP's account are properly credited toward his mortgage obligation as opposed to MP's expenses is an accounting issue to be decided on remand.

Regarding MP's payment of Elliot's attorney fees, the trial court heard testimony from both Rodman and Blake on that issue and ruled that legal expenses, which consisted largely of Elliot's fees, were to be divided equally. Finally, as discussed above, the omission of the tax benefit issue from the judgment was reasonable because, among other reasons, it is unclear that Blake suffered any harm as a result of Rodman's taking the deductions in question for himself or MP, and there was evidence that he did so with Blake's knowledge and consent. The court impliedly and reasonably found that Rodman's taking the depreciation deductions was not a breach of fiduciary duty. The judgment's failure to include express findings on whether Rodman breached his fiduciary duties is not reversible error.

41

V. *Denial of Defendant' Motion for Subdivision Cost Allocation*

The verdict and final judgment state: "The future costs associated with the division of the property [into] separate parcels shall be borne by the parties equally, with the Court maintaining jurisdiction to allocate them at a later time." Around the time the court entered the final judgment, defendants filed a "Motion for Court Order for Subdivision Cost Allocation," seeking a different allocation of subdivision costs from the equal allocation ordered in the judgment. Specifically, defendants requested an order that Blake would not be required to pay a share of certain mitigation and construction costs included in an estimate of the subdivision costs. The court denied defendants' motion on February 17, 2012. Defendants contend the court abused its discretion by denying the motion. Rodman contends that the order denying defendants' motion is not an appealable postjudgment order. We disagree with both contentions.

There are two requirements a postjudgment order must satisfy to be appealable. "The first requirement . . . is that the issues raised by the appeal from the order must be different from those arising from an appeal from the judgment. [Citation.] 'The reason for this general rule is that to allow the appeal from [an order raising the same issues as those raised by the judgment] would have the effect of allowing two appeals from the same ruling and might in some cases permit circumvention of the time limitations for appealing from the judgment.' [Citation.] . . . [¶] The second requirement . . . is that 'the order must either affect the judgment or relate to it by enforcing it or staying its execution.' " (*Lakin v. Watkins Associated Industries* (1993) 6 Cal.4th 644, 651-652.)

The postjudgment order denying defendants' motion for allocation of subdivision costs clearly affects and relates to the judgment because the judgment specifically reserved the court's jurisdiction to reallocate those costs. Any order ultimately setting the allocation of subdivision costs—either by leaving them allocated equally or ordering a different allocation—is an order enforcing the provision in the judgment that allocates those costs. Accordingly, the order denying defendants' motion for allocation of subdivision costs is an appealable postjudgment order under *Lakin.*

Defendants have not met their burden of showing that the court's denial of their motion was an abuse of discretion. The court reserved jurisdiction to reallocate the subdivision costs; it did not *promise* to reallocate them as defendants state in their opening brief. The court's reservation of jurisdiction dates back to the verdict it issued in March 2010. The court's order from the July 14, 2011 hearing reiterated that "costs associated with the subdivision are 50/50[.]" At that hearing the court actually ordered the property sold, but stayed that order and warned that "if either party now stops this [subdivision] process, the court will have the ability to remove the stay of that order, and it would go into effect immediately. I don't want to do that. I really don't. But I have reached the level of frustration with the process where I think that is where we're headed." The court did not articulate its reasons for denying defendants' request for reallocation in February 2012. It may be that the court decided to leave the allocation at 50/50 because it continued to be frustrated by the parties' protracted and highly contentious disputes over the accounting and subdivision. Whatever the court's reason, there is no basis for us to conclude its decision exceeded the bounds of reason.

## VI. *Denial of Motions for Attorney Fees*

As noted above, defendants and Rodman both filed motions for attorney fees on the ground they were prevailing parties under Code of Civil Procedure sections 1032 and 1717. The court denied both motions, determining "there was no prevailing party in this action, as the results were mixed and did not constitute an unqualified win for either side." In light of our decision to reverse the judgment in part and remand for further proceedings that will change the parties' financial obligations under the judgment, we also reverse the trial court's ruling on attorney fees and remand the matter for a new prevailing party determination. (See, *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791 808-809 [reversing damages award and remanding for reconsideration of prevailing party issue]; *Zagami, Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1097 [same]; *Cisneros v. U.D. Registry, Inc.* (1995) 39 Cal.App.4th 548, 576-577 [same].)

## DISPOSITION

The portions of the judgment adopting the judicial accounting's findings regarding the amounts the parties owe on their respective obligations on the mortgage loan and the amount each contributed to MP's expenses are reversed. The trial court is directed to modify the accounting and judgment by applying the entirety of Blake's mortgage/lease payments to her share of the mortgage loan and recalculating the parties' remaining obligations on the mortgage loan, contributions to MP's expenses, and amounts owing on unreimbursed expenses accordingly. The order denying the parties' motions for attorney fees is reversed. The court is directed to reconsider whether there is a prevailing party entitled to attorney fees in light of the changes to the judgment and, if so, determine the amount of fees to be

44

awarded.  The order denying defendants' motion for allocation of subdivision costs is

affirmed.  The parties shall bear their own costs on appeal.


McCONNELL, P. J.

WE CONCUR:

BENKE, J.

HALLER, J.